UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ROGER FRISBY, **Plaintiff,**

v. Civil Action No. 3:17-cv-530-DJH-RSE

LOUISVILLE METROPOLITAN
GOVERNMENT and
STEVE CONRAD, **Defendants.**

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

In September 2016, Roger Frisby learned that he had not been selected to be a Louisville Metro Police Officer. (Docket No. 1, PageID # 3) Frisby sued the Louisville Metro Police Department and LMPD Chief Steve Conrad, alleging that he was not hired because of a survey of officers he conducted while working for the Louisville Metro Department of Corrections (LMDC). (*Id.*, PageID # 3-4) Frisby asserts that this decision constituted an unlawful refusal to hire in violation of his First Amendment right to freedom of speech. (*Id.*, PageID # 4)

Defendants have moved for summary judgment (D.N. 24), arguing that (1) Frisby's survey did not constitute protected speech; (2) Frisby cannot demonstrate that the survey was a substantial factor in the decision not to hire him; (3) their interest in maintaining harmony and efficiency in the police department outweighed Frisby's claim to protected speech; and (4) Frisby failed to develop proof of any LMPD policy or custom causing his rights to be violated. (*Id.*, PageID # 51) Because Frisby has not established a prima facie case of First Amendment retaliation, the Court will grant Defendants' motion for summary judgment.

## I.

Frisby began working as a corrections officer at LMDC in 2006. (D.N. 1, PageID # 2) In the fall of 2012, Frisby was also a student at the University of Louisville. (D.N. 27, PageID # 91) During the fall semester, Frisby took a course, Designing Learning, in which each student was required to complete a project that assessed problems associated with an organization of which the student was already a member. (D.N. 24, PageID # 52; D.N. 27, PageID # 91) Frisby claims that he identified high divorce rates as a social issue commonly associated with being employed in law-enforcement positions, and he set out to examine the causes of those high rates to create a training module for his Designing Learning project. (D.N. 27, PageID # 91; D.N. 27-8, PageID # 175) In researching this project, Frisby used his work email to access and contact thirty-four female LMPD officers. (D.N. 24, PageID # 51) Frisby sent these female officers a survey, asking them to anonymously answer questions. (D.N. 27, PageID # 91) According to Frisby, he surveyed both a control group and a focus group to gather data on the differing behaviors between men and women within the police department and outside of the police department. (*Id.*)

On December 13, 2012, Frisby sent the initial email to a group of female officers asking whether they would be interested in participating in his survey. (*Id.*, PageID # 92; D.N. 24, PageID # 52) He asserts that he received responses from women who were interested, to whom he sent an email with a link to a third-party online survey system. (D.N. 27, PageID # 92) The link took individuals directly to the ten-question survey. (*Id.*) Frisby recalled the survey including questions such as "[d]o you ever hear any water cooler talk about so-and-so being promiscuous and, if so, does that offend you?"; "[h]ow many sexual partners have you had since becoming an officer who are also officers?"; and "[a]re you currently married or single?" (D.N. 27-8, PageID # 189)

Upon completion of the survey, Frisby states, he gathered the anonymous results, "assessed them," and sent the results on December 15, 2012, to those individuals he believed had expressed an interest. (*Id.*) The email, entitled "results," stated in pertinent part:

> The results of our survey are in and have shown to be a perfect match to my theory of "why they do it." First, I would like to start by thanking those of you that participated in the survey and behavior study. What we have learned is not only alarming but should really be discussed in greater detail and formatted as an academy class for the female officer.
>
> In the mind of the female officer she is the underdog from day one by attempting to gain trust, respect, and a belonging feeling from her male counterparts. She will become desensitized by certain behavior and language and even adapt certain male traits as she moves through her career. The study was to discover if that goes as far as SEXUAL BEHAVIOR, and that has rather clearly been proven. Throughout my life I've learned that the stereotypical male is only as faithful as his options and that behavior, be it right or wrong, has almost been accepted by society.

(D.N. 27-1, PageID # 114) The email further stated that the female officers "participated in the study as our focus group and another group of females that work in an office environment participated in our control group" and that the "results could not be more opposite." (*Id.*)

Frisby's email created outrage among female officers. One officer filed a complaint, stating that the communication

> is not only offensive but shows character unbecoming to an officer. He sent it out to "random" female officers and it has a survey concerning our "sexual behavior" as he put it. He said on his second email that he received results from that survey but [no] one I have talked to even participated. The results however according to him indicated we were all promiscuous. I am more th[a]n offended I am extremely angry . . . .

(D.N. 24-5, PageID # 72) Another responded directly to Frisby, noting that his email "was sent to people who did not participate in [his] study, not to mention, [he] failed to state [his] Divorce Rate activity being a part of such survey" and also remarking that Frisby was "out of [his] league, without permission, and spouting results that are vague and demeaning." (D.N. 24-6, PageID # 73) Frisby testified at his deposition that he sought out this information because he believed women in

3

law enforcement "get desensitized by the language that they hear, the things that they see, and slowly they start to lose their femininity, and that's what leads or is a trigger to cheating." (D.N. 27-8, PageID # 190)

Following the complaints of female LMPD officers, Frisby was disciplined by LMDC for unauthorized use of his work email. (D.N. 24-7, PageID # 75-76) Frisby explained that he used his work email because he "had access to the females in law enforcement through [his] email account" and that "coming from my .gov account, it would have a little bit more weight and they would actually look at it and not just discard it to spam." (D.N. 27-8, PageID # 171) He believed that the only way he had access to these officers was through his louisvilleky.gov email. (*Id.*, PageID # 172) In an apology email sent to the LMPD officers, Frisby explained that he was reaching out to his peers for a research project for a course at the University of Louisville. (D.N. 24-7, PageID # 82) He also explained that he was in the process of surveying females from other professions and male officers (*id.*), though he later admitted he had not surveyed any male officers. (D.N. 27-8, PageID # 192) Frisby asserts that he was forced to write an alternate paper on a different subject due to the backlash. (D.N. 24-3, PageID # 69; D.N. 27-8, PageID # 174) Frisby states that his deputy chief at LMDC told him that he could no longer access any of the people in his focus group and to abandon the project. (D.N. 27-8, PageID # 172, 174) Frisby asserts that he ended the study "upon being verbally disciplined by LMDC for his use of its email system to submit the survey questions and requests by his supervisors to drop the research project." (D.N. 27, PageID # 93) But this explanation is inconsistent with the undisputed facts established during discovery.

The fall 2012 semester ended on December 12, 2012, while Frisby's initial survey email was sent the next day on December 13, 2012. (D.N. 24, PageID # 52) Furthermore, Frisby's

4

meeting with his deputy chief was not until December 18, 2012. (D.N. 27-8, PageID # 176) Frisby maintains that he developed his theory during his Designing Learning class in the fall of 2012 and that although his research was incomplete at that time, he had every intention of carrying the project through for another class in a later semester had he not been told by superiors to abandon the project. (D.N. 27, PageID # 93; D.N. 27-8, PageID # 192) Frisby took classes in the spring of 2012, but he failed or withdrew from every class. (D.N. 27-8, PageID # 185) He did not take courses again until the summer of 2014. (*Id.*, PageID # 180)

In 2016, Frisby applied to become an LMPD officer. (D.N. 27, PageID # 93) The LMPD selection process includes a background check and personal interviews that take place over a period of several months. (D.N. 27, PageID # 93) Frisby had satisfied all of the preliminary requirements and was recommended for employment by the officer conducting his background investigation, Alex Lee. (*Id.*, PageID # 94) In Frisby's Background and Investigation report there was a "pros" and "cons" section, and Frisby's report contained no "cons." (D.N. 27, PageID # 95) Lee was aware of Frisby's email/survey issue, to the extent that Frisby had told Lee that he "had completed a research paper on divorce rates among police officers which included a survey that was sent out department wide." (D.N. 27-6, PageID # 139) At his deposition, Lee testified that he was not surprised when he was shown Frisby's discipline action notice, but that if he'd had the document at the time, he would have listed Frisby's discipline in the "con" section. (*Id.*, PageID # 142)

Once investigations are completed, the final part of the "hiring phase" is the applicant review meeting with the chief and a panel of his command staff and members of the Recruitment and Background Investigation Unit. (D.N. 24, PageID # 54; D.N. 27, PageID # 95) Each candidate's picture and qualifications are displayed on a PowerPoint slide, with Chief Conrad

ultimately deciding who is hired as an LMPD officer. (D.N. 27, PageID # 96) On August 12, 2016, Frisby was considered in the chief's Selection Panel meeting. (D.N. 24, PageID # 54) During this meeting, a member of the command staff asked whether Frisby was the person who sent out "that survey." (D.N. 27-7, PageID # 162) Lee responded in the affirmative and explained that Frisby "received discipline for that . . . from Corrections." (*Id.*) Chief Conrad then stated, "okay, I pass." (*Id.*)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of his claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

To prevail on a claim under 42 U.S.C. § 1983, "a plaintiff must show that he was deprived of rights guaranteed under the United States Constitution or federal law by a person acting 'under color of state law.'" *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 429 (6th Cir. 2016) (quoting *Strickland on Behalf of Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997)).

First Amendment retaliation claims are analyzed under a burden-shifting framework. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). To establish a prima facie case of First Amendment retaliation against Defendants under § 1983, Frisby must establish that "(1) he engaged in protected conduct; (2) he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) his protected conduct was a substantial or motivating factor in the adverse action." *Kelly v. Warren Cty. Bd. of Comm'rs*, 396 F. App'x 246, 249-50 (6th Cir. 2010) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). "When a potential public employee seeks to demonstrate protected conduct in the First Amendment retaliation context, he must show that his speech touched on a matter of public concern."[1] *Id.* at 250 (referencing *Connick v. Myers*, 461 U.S. 138, 145-49 (1983)). If Frisby makes the prima facie showing, the burden shifts to Defendants. *Id.* (citing *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Defendants may defeat Frisby's claim by showing that, either under the balancing test established by *Pickering v. Board of Education*, 391 U.S. at 150, or the mixed-motive analysis established by *Mt. Healthy*, 429 U.S. at 287, it would not have hired Frisby "even absent his protected conduct." *Id.*

---

[1] The parties dispute whether Frisby was speaking as a citizen or a public employee when he sent the survey and corresponding results email. (*See* D.N. 27, PageID # 103-05; D.N. 28, PageID # 196) Although Frisby was a public employee at all relevant times, he alleges unlawful refusal to hire. (D.N. 1, PageID # 4) Thus, his status for purposes of this claim is that of a potential public employee, and the citizen/public employee analysis is not relevant. *See Kelly*, 396 F. App'x at 249-50. The Court would reach the same conclusion regardless of Frisby's status because a plaintiff must always show the alleged protected speech was on a matter of public concern in order to establish a prima facie case of First Amendment retaliation. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (finding that a plaintiff must first make a prima facie case of retaliation, showing that "(1) he engaged in constitutionally protected speech" (internal quotation and citation omitted)); *see also Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008) ("First, a court must ascertain whether the relevant speech addressed a matter of public concern." (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003))).

Frisby asserts that his survey and its results addressed a matter of public concern. (D.N. 27, PageID # 105) "Whether a plaintiff's speech addressed a matter of public concern is a question of law . . . ." *Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988). "If the plaintiff's speech did not address a matter of public concern, no further inquiry is necessary." *Id.* Whether Frisby's speech addressed a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146.

It is undisputed that Frisby's survey inquired only about the female officers' sexual behavior. When asked whether his survey was about the "sexual conduct of female members" of the LMPD, Frisby responded, "That's fair to say, yes." (D.N. 27-8, PageID # 189) The "results" email sent by Frisby specifically explained that his survey was sent out to discover if female officers' adoption of certain male traits "goes as far as SEXUAL BEHAVIOR" and asserted that this theory had been "rather clearly proven." (D.N. 24, PageID # 51) The survey itself included questions about "water cooler discussions" of promiscuity and asked the female officers about their number of sexual partners. (D.N. 27-8, PageID # 189) Frisby even noted that his "control group" was asked similarly sex-based questions, such as "how many sexual partners have you had at your office in your current career field?" (*Id.*, PageID # 174)

It is true that "[t]he inappropriate or controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1983). But Frisby has not shown—nor does he actually argue—that the sexual

8

behavior of a group of female LMPD officers is a matter of "political, social, or other concern to the community." *Connick*, 461 U.S. at 146. Even assuming that divorce is a matter of public concern and that the survey was part of larger research on divorce, the emails in question contained no mention of Frisby's divorce theory.[2] (*See* D.N. 24-6, PageID # 73) Rather, Frisby only mentioned such a project in his "apology" email after being reprimanded for inappropriate use of his work email. (D.N. 24-7, PageID # 82)

Further, if Frisby were able to recover the results of his survey and release them to the public, they would convey no information beyond the sexual behaviors of this discrete group of thirty-four female officers. *See Connick*, 461 U.S. at 148 (remarking that "the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo"). No questions about divorce were included in the survey, and Frisby has acknowledged that his survey was solely about the sexual conduct of female LMPD members. (*See* D.N. 77-8, PageID # 170, 189). As such, Frisby's survey does not provide any societal value. *See Albert v. Mitchell*, 42 F. App'x 691, 693 (6th Cir. 2002) ("That two corrections officers engaged in an affair in violation of department rules, though perhaps appealing to the prurient interest of some members of the public and [the plaintiff], does not implicate a matter of public concern.").

Because the alleged protected speech did not address a matter of public concern, no further inquiry is required, and summary judgment is proper. *See Barnes*, 848 F.2d at 733; *Celotex Corp*, 477 U.S. at 322-23; *see also Connick*, 461 U.S. at 146 (noting that if the speech "cannot be fairly

---

[2] Frisby alleges that Conrad's refusal to hire him "because of his earlier survey of officers" was unlawful. Thus, Frisby's survey and its results are the only speech at issue. (*See* D.N. 1, PageID # 4)

characterized as constituting speech on a matter of public concern, it is unnecessary for [the Court] to scrutinize the reasons for [his] discharge").[3]

### III.

Frisby has failed to establish a prima facie case of retaliation because his survey and corresponding emails were not on a matter of public concern. Frisby's First Amendment retaliation claim therefore fails, and the Defendants are entitled to judgment as a matter of law. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Defendants' motion for summary judgment (D.N. 24) is **GRANTED**. A separate judgment will be entered this date.

September 27, 2019

**David J. Hale, Judge**
**United States District Court**

---

[3] The parties also dispute whether LMPD may be held liable under § 1983. (D.N. 24, PageID # 60-61; D.N. 27, PageID # 11-12) But, in light of the Court's conclusion that Frisby has failed to establish a prima facie case of First Amendment retaliation, it need not address the question of municipal liability.